UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

LAMAR BURTON,

                Plaintiff,                  Case No. 1:21-cv-156

v.                                   Honorable Robert J. Jonker

MICHIGAN DEPARTMENT OF
CORRECTIONS et al.,

                Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

### I.    Factual Allegations

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Ionia Correctional Facility (ICF) in Ionia, Ionia County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues the Michigan Department of

Corrections (MDOC), Officer Unknown Odunuga, Sergeant Unknown Coscarelli, Grievance Coordinator Adam Yuhas, Inspector Dennis Cassel, Assistant Deputy Warden Sabrina Davis, Resident Unit Manager B. Oversmith, Warden U. Davids, Prisoner Counselor Matt Jex, Assistant Deputy Warden Unknown Taylor, Sergeant Unknown Kerr, and Unknown Parties named as officers working with Defendant Odunuga.

Plaintiff alleges that he is mentally ill and suffers from a Major Mental Disorder (MMD), Bipolar Disorder, and PTSD. Plaintiff states that on May 27, 2020, Defendant Odunuga became angry and threatened him after Plaintiff told him to do his job and pick up Plaintiff's food tray. Defendant Odunuga then wrote a false threatening behavior misconduct on Plaintiff. Plaintiff was subsequently taken to segregation.

Plaintiff told Defendant Coscarelli about the interaction between himself and Defendant Odunuga and asked him to check the video footage of the incident. Defendant Coscarelli told Plaintiff that the officers are always right, even when they are wrong. Defendant Coscarelli also stated that since Plaintiff liked to get reactions from the officers, they were going to get a reaction from Plaintiff. Plaintiff was placed into an isolation/suicide cell that smelled strongly of human waste. When Plaintiff asked to be placed in a different cell, the officers laughed and walked away. Plaintiff states that the cell is for mentally ill prisoners who might self-harm and that the lights stay on twenty-four hours a day.

On May 28, 2020, Hearing Investigator M. Demps sent a referral determination to mental health and Social Worker D. Maranka stated that Plaintiff should not be placed in segregation because of his mental illness. Maranka recommended LOP (loss of privileges) instead of long-term segregation. Plaintiff was nonetheless placed in a segregation-like setting in the Start program. Plaintiff sent a kite to Defendants Davids and Cassel complaining about his placement.

Plaintiff also requested a grievance form because he was on modified access to the grievance procedure.

On May 29, 2020, Plaintiff complained to Defendants Jex and Oversmith and sent another kite to Defendants Davids and Cassel. Plaintiff did not receive a reply to his kites. On June 1, 2020, Plaintiff told Defendant Jex that he could not sleep because of the light being on all night. Defendant Jex told Plaintiff that he would check into it, but he never did. Plaintiff sent a kite to Defendants Davids and Cassel about the unhealthy conditions in his cell. On June 2, 2020, Plaintiff sent a request for a step I grievance form to Defendant Yuhas. Plaintiff told Defendant Davis about the unhealthy conditions in his cell as she was making her rounds. Defendant Davis told Plaintiff that he must have angered someone to be placed in that cell because they had other cells available. On June 3, 2020, Plaintiff sent another request for a grievance form to Defendant Yuhas. On June 4, 2020, Plaintiff was finally moved to another cell. On June 9, 2020, Plaintiff was found guilty of the misconduct written by Defendant Odunuga.

Plaintiff states that he had been placed into the Start program as a form of punishment and retaliation. Plaintiff claims that the Start program environment has been causing mental and emotional distress because he is limited to using the phone and JPay once a week for fifteen minutes. Plaintiff has difficulty getting proper sleep and concentrating on his legal work because there are loud noises in the unit twenty-four hours a day. On June 11, 2020, and June 17, 2020, Plaintiff sent kites to Defendant Davids seeking to be removed from the Start program. On June 19, 2020, Plaintiff sent a kite to Defendant Jex about his neighbor, who bangs on his footlocker, door, and walls, and yells loudly on a daily basis. On June 23, 2020, Plaintiff spoke to Defendant Jex and asked to be moved to a different cell, but Defendant Jex refused. On June 24,

2020, Plaintiff sent kites to Defendants Oversmith, Davis, Cassel, and Davids, to no avail. Plaintiff's June 29, 2020, request for a grievance form was ignored.

On July 16, 2020, Defendant Coscarelli told Plaintiff that he hoped all the hell he was suffering would teach Plaintiff who was the boss, and that Plaintiff should enjoy his new neighbor. On July 17, 2020, Plaintiff sent a kite to Defendants Davids and Davis complaining about Defendant Yuhas' refusal to provide him with a grievance form. On July 14, 2020, and July 26, 2020, Plaintiff requested grievance forms. On July 28, 2020, Plaintiff sent a JPay message to Defendant Cassel seeking video footage. Defendant Jex again refused to move Plaintiff to a different cell. On July 29, 2020, Plaintiff told Defendant Oversmith that Defendant Jex was refusing to move him and she told Plaintiff to stop crying and deal with it. Plaintiff states that his treatment by Defendants has caused mental, emotional, and physical distress.

Plaintiff claims that Defendants violated his rights under the First, Eighth, and Fourteenth Amendments. Plaintiff seeks compensatory and punitive damages, as well as equitable relief.

## II.    Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

## III.    MDOC

Plaintiff may not maintain a § 1983 action against the MDOC. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98–101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1993). Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of

Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from a § 1983 suit under the Eleventh Amendment. *See*, *e.g.*, *Harrison v. Michigan*, 722 F.3d 768, 771 (6th Cir. 2013); *Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 962 (6th Cir. 2013); *McCoy v. Michigan*, 369 F. App'x 646, 653–54 (6th Cir. 2010). Therefore, Plaintiff's claim against the MDOC is properly dismissed on grounds of immunity.

In addition, the State of Michigan (acting through the MDOC) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613, 617 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989)); *Harrison*, 722 F.3d at 771. Therefore, Plaintiff's claim against the MDOC also is properly dismissed for failure to state a claim under 28 U.S.C. §§ 1915(e)(2)(B)(iii), 1915A(b), and 42 U.S.C. § 1997e(c).

## IV.     Defendants Cassel and Davids

Plaintiff fails to make specific factual allegations against Defendants Davids and Cassel, other than his claim that they failed to conduct an investigation in response to his kites. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.

1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Davids and Cassel engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them.

## V. Defendants Taylor and Kerr

In addition, the Court notes that Plaintiff makes no allegations against Defendants Taylor and Kerr. It is a basic pleading essential that a plaintiff attribute factual allegations to particular defendants. *See Twombly*, 550 U.S. at 544 (holding that, in order to state a claim, a plaintiff must make sufficient allegations to give a defendant fair notice of the claim). The Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what each defendant did to violate the asserted constitutional right." *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) (citing *Terrance v. Northville Reg'l Psych. Hosp.*, 286 F.3d 834, 842 (6th Cir. 2002)). Where a person is named as a defendant without an allegation of specific conduct, the complaint is subject to dismissal, even under the liberal construction afforded to *pro se* complaints. *See Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (dismissing the plaintiff's claims where the complaint did not allege with any degree of specificity which of the named defendants were personally involved in or responsible for each alleged violation of rights); *Griffin v. Montgomery*, No. 00-3402, 2000 WL 1800569, at *2 (6th Cir. Nov. 30, 2000) (requiring allegations of personal involvement against each defendant) (citing *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998)); *Rodriguez v. Jabe*, No. 90-1010, 1990 WL 82722, at *1 (6th Cir. June 19, 1990) ("Plaintiff's claims against those individuals are without a basis in law as the complaint is totally devoid of allegations as to them which would suggest their involvement in the events leading to his injuries."). Plaintiff fails to even mention Defendants Taylor and Kerr in the

body of his complaint. His allegations fall far short of the minimal pleading standards under Fed. R. Civ. P. 8 (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

## VI. Defendants Unknown Parties

Plaintiff asserts that Unknown Parties Corrections Officers were present when Defendant Odunuga wrote a false misconduct ticket on Plaintiff and were aware of the fact Defendant Odunuga was lying. Plaintiff fails to allege any other facts regarding Defendants Unknown Parties.

Plaintiff's allegations against the unknown corrections officers are wholly conclusory. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Iqbal*, 556 U.S. at 678–79; *Twombly*, 550 U.S. at 555.

Moreover, a plaintiff must show that a defendant had some duty or authority to act. *See e.g. Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989) (lower level official not liable for shortcomings of building); *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 351 (6th Cir. 1984) (mere presence at the scene is insufficient grounds to impose Section 1983 liability in the absence of a duty to act); *accord Hall v. Shipley*, 932 F.2d 1147 (6th Cir. 1991). In this case, Plaintiff's allegations fail to show that Unknown Parties, who were Defendant Odunuga's co-workers, had any duty or authority to prevent Defendant Odunuga from writing a false ticket on Plaintiff. Therefore, Defendants Unknown Parties are properly dismissed.

## VII. Defendant Yuhas

Plaintiff's only claim against Defendant Yuhas is that he refused to provide him grievance forms when Plaintiff requested them. Plaintiff has no due process right to file a prison grievance. The courts repeatedly have held that there exists no constitutionally protected due

process right to an effective prison grievance procedure. *See Hewitt v. Helms*, 459 U.S. 460, 467 (1983); *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569–70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994) (collecting cases). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendants' conduct did not deprive him of due process.

Plaintiff's right to petition government is not violated by Defendant's failure to provide him with a grievance form. The First Amendment "right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views." *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999).

Moreover, Defendant's actions have not barred Plaintiff from seeking a remedy for his grievances. *See Cruz v. Beto*, 405 U.S. 319, 321 (1972). "A prisoner's constitutional right to assert grievances typically is not violated when prison officials prohibit only 'one of several ways in which inmates may voice their complaints to, and seek relief, from prison officials' while leaving a formal grievance procedure intact." *Griffin v. Berghuis*, 563 F. App'x 411, 415–16 (6th Cir. 2014) (citing *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 130 n.6 (1977)). Indeed, Plaintiff's ability to seek redress is underscored by his pro se invocation of the judicial process. *See Azeez v. DeRobertis*, 568 F. Supp. 8, 10 (N.D. Ill. 1982). Assuming that Plaintiff was improperly prevented from filing a grievance, his right of access to the courts to petition for

redress of his grievances (i.e., by filing a lawsuit) cannot be compromised by his inability to file institutional grievances, and he therefore cannot demonstrate the actual injury required for an access-to-the-courts claim. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 355 (1996) (requiring actual injury); *Bounds v. Smith*, 430 U.S. 817, 821–24 (1977). The exhaustion requirement only mandates exhaustion of *available* administrative remedies. *See* 42 U.S.C. § 1997e(a). If Plaintiff were improperly denied access to the grievance process, the process would be rendered unavailable, and exhaustion would not be a prerequisite for initiation of a civil rights action. *See Ross v. Blake*, 136 S. Ct. 1850, 1858–59 (2016) (reiterating that, if the prisoner is barred from pursuing a remedy by policy or by the interference of officials, the grievance process is not available, and exhaustion is not required); *Kennedy v. Tallio,* 20 F. App'x 469, 470–71 (6th Cir. 2001). In light of the foregoing, the Court finds that Plaintiff fails to state a cognizable claim against Defendant Yuhas.

## VIII.   Due process

Plaintiff claims that his major misconduct conviction violated his right to procedural due process. The Fourteenth Amendment protects an individual from deprivation of life, liberty or property, without due process of law." *Bazzetta v. McGinnis*, 430 F.3d 795, 801 (6th Cir. 2005). To establish a Fourteenth Amendment procedural due process violation, a plaintiff must show that one of these interests is at stake. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). Analysis of a procedural due process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient . . . ." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted).

The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v.*

*Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to that Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995).

Plaintiff's major misconduct charge and conviction affected a number of Plaintiff's interests, but none of them fall into either of the categories identified in *Sandin* as protected by due process, i.e., an inevitable effect on the duration of Plaintiff's sentence or an atypical and significant hardship. As to the first category, Plaintiff has not alleged a deprivation that will inevitably affect the duration of his sentence. Because Plaintiff is serving a life sentence, he is not entitled to earn disciplinary credits.

As to the second category, Plaintiff has not alleged that he suffered a "significant and atypical deprivation." According to the hearing report, which is attached to Plaintiff's complaint, Plaintiff was sentenced to 10 days in detention and 30 days loss of privileges as a result of the misconduct conviction. (ECF 1-27, PageID.46.) Confinement in administrative segregation "is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration." *Hewitt*, 459 U.S. at 468. Thus, it is considered atypical and significant only in "extreme circumstances." *Joseph v. Curtin*, 410 F. App'x 865, 868 (6th Cir. 2010). Generally, courts will consider the nature and duration of a stay in segregation to determine whether it imposes an "atypical and significant hardship." *Harden-Bey v. Rutter*, 524 F.3d 789, 794 (6th Cir. 2008).

In *Sandin*, the Supreme Court concluded that the segregation at issue in that case (disciplinary segregation for 30 days) did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484. Similarly, the Sixth Circuit has held that placement in administrative segregation for two months does not require the protections of due process. *See Joseph*, 410 F. App'x at 868 (61 days in segregation is not atypical and significant). It has also held, in specific circumstances, that confinement in segregation for a much longer period of time does not implicate a liberty interest. *See, e.g.*, *Jones*, 155 F.3d at 812–13 (two years of segregation while the inmate was investigated for the murder of a prison guard in a riot); *Mackey v. Dyke*, 111 F.3d 460 (6th Cir. 1997) (one year of segregation following convictions for possession of illegal contraband and assault, including a 117-day delay in reclassification due to prison crowding). Generally, only periods of segregation lasting for several years or more have been found to be atypical and significant. *See, e.g.*, *Selby v. Caruso*, 734 F.3d 554, 559 (6th Cir. 2013) (13 years of segregation implicates a liberty interest); *Harris v. Caruso*, 465 F. App'x 481, 484 (6th Cir. 2012) (eight years of segregation implicates a liberty interest); *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest).

Plaintiff's confinement in detention for 10 days is less than the 60-day period in *Joseph* that the Sixth Circuit held was *not* atypical and significant. In addition, the restrictions imposed on Plaintiff were far less significant than the lengthy periods of segregation in *Mackey* and *Jones*, which did not implicate a liberty interest. Thus, Plaintiff's confinement in detention did not trigger a right to due process.

The same is true for the 30 days of lost privileges. Federal courts consistently have found that prisoners have no constitutionally protected liberty interest in prison vocational,

rehabilitation, and educational programs under the Fourteenth Amendment. *See, e.g., Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976) (Due Process Clause not implicated by prisoner classification and eligibility for rehabilitative programs, even where inmate suffers "grievous loss"); *Argue v. Hofmeyer*, 80 F. App'x 427, 429 (6th Cir. 2003) (prisoners have no constitutional right to rehabilitation, education or jobs); *Canterino v. Wilson*, 869 F.2d 948, 952–54 (6th Cir. 1989) (no constitutional right to rehabilitation); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989) (no constitutional right to prison employment); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job"); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir. 1996) (participation in a rehabilitative program is a privilege that the Due Process Clause does not guarantee); *Rizzo v. Dawson*, 778 F.2d 527, 531 (9th Cir. 1985) (no constitutional right to rehabilitative services). Moreover, "as the Constitution and federal law do not create a property right for inmates in a job, they likewise do not create a property right to wages for work performed by inmates." *Carter*, 69 F. App'x at 680 (citing *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir. 1991), and *James v. Quinlan*, 866 F.2d 627, 629–30 (3d Cir. 1989)). Consequently, Plaintiff's loss of privileges did not trigger a right to due process.

Plaintiff also claims that his placement in the Start program violated his due process rights. According to MDOC Director's Office Memorandum (DOM) 2021-17, Start Units offer alternative placement for eligible prisoners who would otherwise be classified to administrative segregation and provide a structured environment where prisoners move through progressive levels as they demonstrate positive behavior and program participation with the goal of reintegration back into the general population.

The targeted prisoner population groups for placement in a Start Unit are:

> Prisoners who have been diagnosed with serious mental illness, as
> defined by Mental Health Services policy, procedure and protocol,

whose disruptive behavior would warrant reclassification to administrative segregation.

Prisoners who refuse to return to a traditional general population setting that has resulted in extended administrative segregation placement.

Prisoners who have a history of repeated disruptive behavior, who would otherwise be classified to administrative segregation for new negative behavior.

Other prisoners who would benefit from placement in the Start Unit based on their disruptive behavior, as approved by the CFA Deputy Director or designee. This may include prisoners who are within one year of their discharge date or who have received positive parole action.

Each prisoner accepted for placement in a Start Unit will be provided intake processing, during which time the prisoner's behavioral history and program needs will be reviewed to develop the prisoner's individualized Start Plan. The Start Plan shall clearly define behavioral benchmarks for increased privileges and programs for the prisoner while housed in a Start Unit.

After intake processing, there are four stages through which prisoners may progress while in a Start Unit. Stage 0 is the most restrictive and Stage 3 is the least restrictive. A prisoner's progression within a Start Unit will be based on the individual prisoner's behavior at each stage and subject to recommendations made by the housing unit team and Security Classification Committee (SCC).

Prisoners in a Start Unit may participate in all activities and services provided to prisoners in a traditional general population setting, subject to restrictions to preserve the custody and security of the facility. This may include restrictions on group activities and activities that require the mass movement of prisoners. Activities that are traditionally provided to general population prisoners in a group setting, or that require mass movement, may instead be provided to these prisoners in the housing unit, the prisoner's cell, or in another specifically designated area of the institution. Activities also may be provided at specifically designated times or under escort, as needed. Personal property also may be restricted or used as an incentive for progression through Start Unit stages.

MDOC DOM 2021-17 (effective Jan. 1, 2021).

Plaintiff claims that the Start program environment has been causing him mental and emotional distress because he is limited to using the phone and JPay once a week for fifteen minutes. Plaintiff also states that there are loud noises in the unit twenty-four hours a day.

However, the Start Units are an alternative to administrative segregation, where restrictions are greater, that permits the participants to earn fewer restrictions by modifying their behavior. As noted above, the Court has generally held that only periods of segregation lasting for several years or more are atypical and significant. *See, e.g.*, *Selby*, 734 F.3d at 559 (13 years of segregation implicates a liberty interest); *Harris*, 465 F. App'x at 484 (eight years of segregation implicates a liberty interest); *Harden-Bey*, 524 F.3d at 795 (remanding to the district court to consider whether the plaintiff's allegedly "indefinite" period of segregation, *i.e.*, three years without an explanation from prison officials, implicates a liberty interest). Plaintiff fails to allege facts showing that the Start Unit was atypical and significant in light of his life sentence.

## IX.    Eighth Amendment

Plaintiff claims that the conditions of his confinement violated his rights under the Eighth Amendment. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345–46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey*, 832 F.2d at 954 (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600–01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954. "Routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)

(quoting *Rhodes*, 452 U.S. at 347). As a consequence, "extreme deprivations are required to make out a conditions-of-confinement claim." *Id.*

In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479–80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims)); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)). The deliberate-indifference standard includes both objective and subjective components. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35–37. To satisfy the objective prong, an inmate must show "that he is incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Under the subjective prong, an official must "know[] of and disregard[] an excessive risk to inmate health or safety." *Id.* at 837. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk." *Id.* at 836. "[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Plaintiff claims that, following the issuance of a misconduct ticket by Defendant Odunuga on May 27, 2020, he was placed into an isolation cell that smelled of human waste. Plaintiff remained in that cell for eight days, until June 4, 2020, when he was moved to the Start Unit. The Court notes that being forced to reside in a cell that smells of human waste is certainly

reprehensible. However, such an allegation, standing alone, does not show that Plaintiff suffered a substantial risk of serious harm to his health and safety.

Plaintiff also claims that the conditions and restrictions imposed upon him in the Start Unit have caused him mental distress in violation of his Eighth Amendment rights. Plaintiff cites limited phone use and access to JPay messages. He also claims that the other Start Unit prisoners are disruptive and noisy.

The Eighth Amendment prohibits punishments that are not only physically barbaric, but also those which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotations omitted). To establish an Eighth Amendment claim, the prisoner must show that he was deprived of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347. Conditions that are restrictive or even harsh, but are not cruel and unusual under contemporary standards, are not unconstitutional. *Id.* Thus, federal courts may not intervene to remedy conditions that are merely unpleasant or undesirable.

As noted above, the Start program is an alternative to placement in administrative segregation. Placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson*, 503 U.S. at 9 (quoting *Rhodes*, 452 U.S. at 347). Although it is clear that Plaintiff was denied certain privileges as a result of his placement in the Start Unit, he does not allege or show that he was denied basic human needs and requirements. The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation. *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011);

*Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008).  Moreover, Plaintiff cannot bring an Eighth Amendment claim for emotional or mental damages because he does not allege a physical injury.  *See* 42 U. S.C. §1997e(e); *see also Hudson*, 503 U.S. at 5; *Harden-Bey*, 524 F.3d at 795. As a result, Plaintiff fails to state an Eighth Amendment claim against Defendants.

## X.  Retaliation

Finally, Plaintiff claims that Defendants Odunuga and Coscarelli retaliated against him after Plaintiff told Defendant Odunuga to do his job and pick up Plaintiff's food tray. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish three elements:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct.  *Id.*  Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Initially, the Court notes that Plaintiff has failed to allege facts showing that he was engaged in protected conduct, such as filing a grievance or otherwise pursuing his right to petition the government.  Plaintiff has no protected constitutional right to order prison officials to do their jobs.  Therefore, the fact that Defendant Odunuga wrote a threatening behavior ticket on him does not implicate Plaintiff's rights under the First Amendment.

Moreover, a prisoner's claim that he was falsely accused of a major misconduct is barred where there has been a finding of guilt.  *See Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013) (holding that a factual finding in a major misconduct proceeding has preclusive effect

and is not subject to challenge in a § 1983 action). However, as the Sixth Circuit subsequently qualified in *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014), not every factual finding is entitled to preclusive effect. Instead,

> the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. [*Peterson*, 714 F.3d] at 916-17. It likewise turns on the court's "sense of justice and equity," *Blonder-Tongue Labs., v. Univ. of Ill. Found.*, 402 U.S. 313, 334 (1971), which may require a case-by-case analysis of surrounding circumstances.

*Roberson*, 770 F.3d at 404-05.

In *Maben v. Thelen*, 887 F.3d 252 (6th Cir. 2018), the Sixth Circuit further clarified the limitations of the preclusion doctrine, as follows"

> To determine whether we must give preclusive effect to "factfinding from Michigan prison hearings," we look to four requirements, all of which must be met: (1) the state agency "act[ed] in a 'judicial capacity'"; (2) the hearing officer "resolved a disputed issue of fact that was properly before it"; (3) the prisoner "had an adequate opportunity to litigate the factual dispute"; and, (4) if these other three requirements are met, we must "give the agency's finding of fact the same preclusive effect it would be given in state courts." *Peterson v. Johnson*, 714 F.3d 905, 911–13 (6th Cir. 2013) (internal citation and quotation marks omitted).

> In *Peterson*, the Court considered, as a matter of first impression, whether a hearing officer's factual determination at a Michigan *major* misconduct hearing has preclusive effect in litigation brought by a prisoner under § 1983. *Id*. at 908, 911. The Court concluded that, because all four requirements were met, the "hearing officer's *factual* finding that [the prisoner] was the one who grabbed [the officer's] hand precludes a contrary finding in federal court." *Id*. at 917. In *Roberson v. Torres*, the Court considered the same issue, and identified the four requirements listed above. 770 F.3d 398, 403–04 (6th Cir. 2014). The Court said that *Peterson* does not mean that "any factual findings by a hearing officer in a major-misconduct hearing in a Michigan prison are to be accorded preclusive effect." *Id*. at 404. "*Peterson* is not a blanket blessing on every factual finding in a major-misconduct hearing." *Id*.

> > Indeed, the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so—not just in theory, but in practice. It

> likewise turns on the court's sense of justice and equity, which may require a case-by-case analysis of surrounding circumstances.
>
> *Id*. at 404–05 (internal citations and quotation marks omitted). The Court declined to decide the preclusion question, and remanded the case to the district court to consider the argument for the first time. *Id*. at 405. The Court instructed the district court to "give particular attention to the fairness and accuracy of the factual findings made by the major-misconduct hearing officer." *Id*. The Court advised that "[n]umerous inquiries may be relevant to the district court's analysis," like "why the hearing officer refused to review the alleged video of the incident, whether the hearing officer provided a sufficient and reasonable basis for her factual findings, and whether the testimony of other witnesses corroborated the accounts provided by either [the prisoner] or [the officer]." *Id*. at 405.

*Maben*, 887 F.3d at 259. The *Maben* court expressly rejected the application of *Peterson/ Roberson* preclusion to minor misconduct proceedings in Michigan, both because the state agency was not acting in a judicial capacity and because the prisoner in such proceedings does not have an adequate opportunity to litigate the factual dispute. *Id*. at 261.

Plaintiff attaches a copy of the hearing report on the major misconduct charge to his complaint. (ECF No. 1-27, PageID.46–47.) The hearing report states that the misconduct report was read to and discussed with Plaintiff, as was the hearing investigation report. (*Id.* at PageID.46.) Plaintiff was present for the hearing via videoconference. (*Id.*) The hearing investigation report consisted of a two-page statement by Plaintiff, statements from four other prisoners, two pages of mental health screening, two pages of video summary, and the surveillance video of the incident. (*Id.*)

During the hearing, Plaintiff stated that Defendant Odunuga always likes to engage in conversation with inmates and was looking at pictures with Plaintiff's neighbor while he was supposed to be picking up meal trays. Plaintiff told Defendant Odunuga to "do his job," which caused Defendant Odunuga to become angry and threaten to kill Plaintiff. Defendant Odunuga then knocked the food trays off the cart and threatened to have Plaintiff placed in the hole. (*Id.*) In the Reasons for Findings, the Hearings Officer states:

This Administrative Law Judge finds the reporting staff member's statement to be specific, reliable and credible. ALJ finds that the prisoner did state "fuck you bitch, I will beat your ass" to the reporting staff member. These words express an intent to injure or physically abuse a staff member. The prisoner denies that he said this and states that the officer was mad because he told him to do his job. While it does appear that the officer was upset on the previous round, this occurred at 1647, not at 1634. Video shows that at 1634, the officer appears to be arguing with Burton and he pushes the trays off the cart. The officer picks up the trays from the floor and again appears to exchange words with Burton. At 1647, officer Odunuga is completing rounds and stops at Burton's cell and there appears to be an exchange of words. The prisoner indicates that he didn't say anything to Odunuga on the second round, yet it appears that there was an exchange of words. I find there was clearly an incident between the prisoner and officer. I don't find it likely that it was one-sided. The prisoner witnesses are describing the earlier incident, not the round where the officer alleges this occurred. I find the report clear and persuasive. I find the prisoner's denial that he said anything not supported by the video, which shows an exchange.

(*Id.*)

As noted above, the preclusion doctrine applies where the state agency acted in a judicial capacity, the Hearings Officer resolved a disputed issue that was properly before it, and the prisoner had an adequate opportunity to litigate the factual dispute. *Maben*, 887 F.3d at 259. Each of these factors is met in this case. Plaintiff's major misconduct hearing was conducted by an Administrative Law Judge, Plaintiff's statement was considered by the ALJ along with the statements of witnesses and video evidence, Plaintiff was present during the hearing via videoconference and was able to participate, and finally the ALJ resolved the issue of fact regarding whether Plaintiff threatened Defendant Odunuga. Therefore, Plaintiff's claim that the major misconduct was retaliatory is precluded by the finding of guilt in this case.

For both reasons, Plaintiff's retaliation claims against Defendants Odunuga and Coscarelli are properly dismissed.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28

U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:    July 7, 2021          /s/ Robert J. Jonker                              
                                ROBERT J. JONKER
                                CHIEF UNITED STATES DISTRICT JUDGE